FILED
2024 JAN 30 PM 3:44
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| ROBERT D.; and K.D., <br><br> Plaintiffs, <br><br> v. <br><br> BLUE CROSS OF CALIFORNIA d/b/a ANTHEM BLUE CROSS; and SEQUOIA TECH PROGRAM HEALTH & WELFARE BENEFITS PLAN, <br><br> Defendants. | MEMORANDUM DECISION AND ORDER REMANDING PLAINTIFFS' CLAIM FOR BENEFITS <br><br> Case No. 2:20-cv-138-HCN-DAO <br><br> Howard C. Nielson, Jr. <br> United States District Judge |

Plaintiffs Robert D. and K.D. sued Anthem Blue Cross, asserting two claims under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*): (1) a claim for payment of improperly denied benefits, and (2) a claim for violations of the Mental Health Parity and Addiction Equity Act.[1] This court granted Anthem's motion to dismiss Plaintiffs' Parity Act claim. Both sides now move for summary judgment on the remaining claim.[2] For the following reasons, the court denies Anthem's motion and grants Plaintiffs' motion in part, remanding Plaintiffs' remaining claim to Anthem for reconsideration.

---

[1] Although Plaintiffs initially asserted claims against the Sequoia Tech Program Health & Welfare Benefits Plan, they have voluntarily dismissed these claims without prejudice. *See* Dkt. No. 15.

[2] Plaintiffs at first asserted claims for payment of benefits with respect to care that K.D. received at two residential treatment facilities: WinGate Wilderness Therapy and Fulshear Treatment to Transition. After the court dismissed Plaintiffs' Parity Act claims, the parties stipulated to dismissal of Plaintiffs' claim for payment of benefits at WinGate. *See* Dkt. No. 48.

I.

Anthem serves as the claims administrator for the Sequoia Tech Program Health & Welfare Benefits Plan.[3] *See* Dkt. No. 70 at 2 ¶ 2. Robert D. was a participant in the Plan and K.D. was a beneficiary. *See id.* Among other covered services, the Plan provides benefits for medically necessary mental-health and substance-abuse services at residential treatment facilities. *See* AR 4583.[4]

To be deemed medically necessary, such residential treatment must be "[a]ppropriate and necessary for the diagnosis or treatment of the medical condition," as required by the Plan's general definition of medical necessity. AR 4673. For certain services, the Plan also requires claimants to satisfy Anthem's medical policies and clinical guidelines. *See* AR 4627. These policies and clinical guidelines, which are developed and reviewed by a committee of physicians and Anthem's medical directors, "establish decision protocols for particular diseases or treatments," as well as "medical necessity criteria used to determine whether a . . . service . . . is covered." AR 4662 (cleaned up).

One of these guidelines is the "Clinical UM Guideline" for "Psychiatric Disorder Treatment," which establishes medical-necessity criteria for admission to a residential treatment center. *See* AR 4720. A Plan member must meet all of the listed criteria for admission to a residential treatment center to be deemed "medically necessary." Among these criteria, a Plan member must show that she is "manifesting symptoms and behaviors which represent a

---

[3] The Plan's name changed and new plan terms took effect about halfway through K.D.'s stay at Fulshear. *See* AR 7762. Because Anthem analyzed and decided Plaintiffs' request for benefits under the Plan in effect at the time of K.D.'s admission to Fulshear, the court refers to and cites that Plan.

[4] Citations to the administrative record are noted "AR XX." The administrative record can be found at Docket Numbers 61–65, 67–69, & 85.

deterioration from the member's usual status and include either self injurious or risk taking behaviors that risk serious harm and cannot be managed outside of a 24 hour structured setting or other appropriate outpatient setting." [5] *Id.*

In 2016, K.D. began receiving treatment at Discovery Ranch, a subacute inpatient treatment facility for mental health disorders and substance abuse. *See* AR 2124–25. While K.D. was receiving treatment at Discovery Ranch, Dr. Todd Corelli, a licensed clinical psychologist, diagnosed her with "313.9 Unspecified Attachment Disorder," which "stem[ed] from being abandoned by her [biological] parents at a hospital in Ukraine when she was two years old, followed by living in two different orphanages before being adopted by her parents when she was four years old." AR 2137–39. Dr. Corelli also diagnosed K.D. with "311 Unspecified Depressive Disorder," "314.01 Attention-Deficient/Hyperactivity Disorder, Combined Presentation," and "315.9 Unspecified Neurodevelopmental Disorder (Executive Dysfunction; Poor Working Memory)." *Id.* Dr. Corelli opined that "[t]he clinical issues noted in [K.D.]'s test results suggest that for the foreseeable future, [K.D.] will continue to need intensive residential treatment in order to address her attachment issues." AR 2138.

K.D. spent thirteen months at Discovery Ranch. Two weeks after her discharge in March 2017, K.D. was admitted to Red Mountain Sedona, an adult program, which she left after three weeks. *See* AR 2122. She then spent a month at WinGate, a wilderness treatment program. *See* AR 2037, 2120, 2122. There, she was diagnosed with "F12.20 Cannabis use disorder. Moderate, in partial remission due to being in treatment," "F81.0 Specific learning disorder, with

---

[5] The guideline's reference to an "*other* appropriate *outpatient* setting" does not appear to apply in this case, where the disputed care was K.D.'s 24/7 residential treatment. Neither party has suggested otherwise, whether in Anthem's denial letters, Plaintiffs' appeal letter, or the summary-judgment briefing.

3

impairment in reading," "F23.1 Persistent depressive disorder (dysthymia)," "Z62.812 Personal history (past history) of neglect in childhood," and "Z62.820 Parent-child relational problem." AR 2119–20.

After her discharge from WinGate, K.D. entered residential treatment at Fulshear Treatment to Transition on May 17, 2017. *See* AR 2122. Upon admission to Fulshear, K.D. was diagnosed with "Attachment Disorder" and "Borderline Personality Disorder." AR 2039. The admission notes recommended residential treatment because the "client needs 24 hour support for her behavioral issues." *Id*.

A week after K.D.'s admission to Fulshear, Dr. Jacob Moussai issued a letter on behalf of Anthem denying coverage for her residential treatment there. In this denial letter, Dr. Moussai determined that K.D.'s admission to Fulshear "[did] not meet the criteria for 'medical necessity.'" AR 1233. He explained that Anthem "reviewed the request using the plan clinical guideline . . . Psychiatric Disorder Treatment Residential Treatment Center" and that "[t]he plan clinical criteria considers short-term residential treatment medically necessary for those who meet all the following: 1) their behaviors have worsened or their actions risk serious harm; 2) the behaviors or actions cannot be managed outside of a 24 hour structured setting; 3) their living situation keeps them from getting needed treatment; and 4) improvement can be expected from a short-term residential stay." *Id.* Dr. Moussai concluded that "[t]he information we have does not show 24 hour structured care is needed." *Id.*

K.D. nevertheless continued treatment at Fulshear. In the meantime, Plaintiffs appealed Anthem's denial decision. *See* AR 1217. In their appeal letter, Plaintiffs argued, *inter alia*, that this decision was flawed because Dr. Moussai made only "vague assertions" that "failed to explain how [K.D.'s] treatment did not meet the cited criteria." AR 1218–19. Plaintiffs also

4

included copies of medical records and several letters from providers who had treated K.D. *See* AR 1220.

In January 2018, Anthem affirmed the denial decision. In her letter affirming the denial, Dr. Amy Dewar represented that she had "reviewed all the information that was given to us before with the first request for coverage," as well as "all that was given to us for the appeal," including "new information from the medical record plus letters." AR 106, 109. She then quoted the Plan's definition of "medically necessary," and noted that Anthem "based this decision on this health plan guideline (Psychiatric Disorder Treatment–Residential Treatment Center (RTC))." AR 106–107. Dr. Dewar concluded that admission for treatment at Fulshear was not "medically necessary" because K.D. was "not at risk for serious harm that needed 24 hour care" and that K.D. thus "could have been treated with outpatient services." AR 106.

Plaintiffs then requested an independent review from the State of California's Department of Managed Health Care. *See* AR 1–40, 54, 95–97. The independent, external reviewer assigned by the State upheld Anthem's denial of benefits. *See* AR 4510–20. Afterwards, Plaintiffs brought this suit.

## II.

When, as here, both parties to an ERISA case have "moved for summary judgment and stipulated that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (cleaned up). The court reviews a denial of benefits "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan does not give Anthem discretionary authority to determine eligibility for mental health or substance abuse treatment benefits, or to construe the terms of the plan. See AR 4533–4710. The parties thus agree that *de novo* review is appropriate in this case. See Dkt. No. 70 at 21; Dkt. No. 66 at 8.[6]

The *de novo* standard of review requires the court to "determine whether the administrator made a correct decision." *Brian J. v. United Healthcare Ins., Co.*, --- F. Supp. 3d ---, 2023 WL 2743097 at *4 (D. Utah Mar. 31, 2023) (quoting *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (unpublished)). "In reviewing [Anthem's] determination, the court is limited to the rationale given by [Anthem] for the denial of benefits." *Id.* at *6 (citing *Kellogg v. Metropolitan Life Ins. Co.*, 549 F.3d 818, 828–29 (10th Cir. 2008) (applying *de novo* review)). "'Remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision' but 'the evidence in the record' does not 'clearly show that the claimant is entitled to benefits.'" *Id.* (quoting *Carlile v. Reliance Standard Life Ins. Co.*, 988 F.3d 1217, 1229 (10th Cir. 2021) (cleaned up) (applying *de novo* review)).

### III.

ERISA imposes two broad statutory mandates on a claims administrator, like Anthem, that denies a claim for benefits. First, the administrator must "provide adequate notice in writing . . . setting forth the specific reasons for [the] denial, written in a manner calculated to be

---

[6] Plaintiffs also argue that *de novo* review is required, regardless of the terms of the Plan, because Anthem violated the ERISA claim-procedure regulations in processing K.D.'s claim. *See* Dkt. No. 70 at 21–25. Given that Anthem concedes that *de novo* review is appropriate in light of the Plan's language, the court need not decide whether the alleged procedural irregularities would independently require *de novo* review in this case.

understood by the participant." 29 U.S.C. § 1133(1). Second, the administrator must provide an internal appeals process affording "a reasonable opportunity . . . for a full and fair review" of the benefits denial. 29 U.S.C. § 1133(2).

The Department of Labor has promulgated regulations elaborating on these statutory mandates. One of these regulations addresses what information must be included in an administrator's denial letter. *See* 29 C.F.R. § 2560.503-1(g)(1). In addition to explaining the "specific reason or reasons" for the denial, *id.* at (g)(1)(i), when the denial is "based on [ ] medical necessity," the letter must also include "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *Id.* at (g)(1)(v)(B).

### A.

Plaintiffs first contend that Anthem's denial of benefits was procedurally flawed because Anthem improperly "disregarded" the "opinions" of K.D.'s treating providers by failing to "meaningfully" engage with those opinions during the appeal. Dkt. No. 70 at 26–27. The court rejects this argument.

Under controlling Supreme Court precedent, courts cannot "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Nonetheless, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* And the Tenth Circuit has recently held that although a plan administrator is "not required to defer to" the

medical opinions of a treating physician, the administrator is "required to engage with and address" those opinions. *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1237 (10th Cir. 2023).

In this case it is clear from the administrative record that Anthem's reviewers *did* consider the information from K.D.'s treating providers when denying K.D.'s claim on medical-necessity grounds. In his physician-reviewer notes, Dr. Moussai recorded that he conducted a "peer to peer discussion" with one of K.D.'s treatment providers. AR 4791; *see also* Dkt. No. 66 at 10 & n.5. Based on that discussion, Dr. Moussai noted that the "decision" for K.D. to seek treatment at Fulshear was made "by her parents," who were "concerned about 'inappropriate boundaries [with] boys.'" AR 4791. He thus concluded that K.D. failed to satisfy the "severity criteria" for residential treatment because she "appear[ed] to be at baseline" with "no acute exacerbation of symptoms warranting [residential treatment]." *Id.*

For her part, Dr. Dewar recorded in her notes that she reviewed 940 pages of medical records, *see* AR 4793, as well as K.D.'s "[r]esidential progress notes," AR 4795. Dr. Dewar noted that she nonetheless disagreed that residential treatment was medically necessary because K.D. was "not described as dangerous, violent, threatening, or aggressive," because she did not need "a 24-hour monitored setting to receive psychotherapy and medication management," and because K.D.'s "[t]reatment goals" at Fulshear "appeared focused on healthy relationships and developing boundaries," thus "addressing chronic behavioral problems and relationship patterns"—"not an acute psychiatric disorder, or an exacerbation of a chronic psychiatric disorder." AR 4797.

The court rejects Plaintiffs' apparent contention that it must ignore these notes and consider only what is expressly stated in the denial letters when deciding whether Anthem

adequately engaged with K.D.'s treating providers. The governing regulation does not require that the denial letters *themselves* include "an explanation of the scientific or clinical judgment for the determination." 29 C.F.R. § 2560.503-1(g)(1)(v)(B). Instead, the regulation gives plan administrators a choice: "*either*" (1) the letters must "set forth" such an explanation, "*or*" (2) the letters must include "a statement that such explanation will be provided free of charge upon request." *Id.* (emphases added).

Here, Anthem chose the latter option. In the initial denial letter, Dr. Moussai explained: "To request the applicable criteria used in this case, or other documents related to this determination, please call Medical Care Management at: (800) 274-7767 and it will be provided free of charge." AR 4736. Likewise, in the second denial letter, Dr. Dewar acknowledged that K.D.'s parents had "requested that future denials include references to the medical records which support the determination that the treatment was not medically necessary," and the letter thus promised to "provide the documents relevant to both the initial review and the level one appeal review . . . under separate cover," including "the narratives written by the physicians who have reviewed your case" along with "the Summary Plan Description, Anthem's Clinical Guidelines and physician reports." AR 4747. Anthem followed through on this promise. On or about January 24, 2018, shortly after sending the second denial letter, Anthem sent Plaintiffs all of these materials, including the reviewer notes discussed in this opinion. *See* AR 4711–97.

To be sure, in *D.K. v. United Behavioral Health*, the Tenth Circuit held that, in that case, "[t]he district court was correct to focus its review on the denial letters," 67 F.4th at 1239, and that, in future cases, a court's review "*may* be appropriately limited to the denial letters," *id.* at 1243 (emphasis added). But the Tenth Circuit did not say that a district court *always* must limit its review to the four corners of the denial letters.

Indeed, in discussing the defendant's "statutory obligations under ERISA," the court in *D.K.* favorably cited the regulation that explicitly permits plan administrators who deny benefits based on medical necessity to *either* (1) provide the scientific or clinical judgment for the determination in the denial letter itself *or* (2) offer, in that letter, to provide that judgment upon request, free-of-charge. *See id.* (analogizing the relevant plan provision to the defendant's statutory obligations and citing 29 C.F.R. § 2560.503-1(g)(v)(B)). This court will not assume that the Tenth Circuit misunderstood or disregarded the clear import of the very regulation it cited. Instead, this court concludes that the plan administrator in *D.K.* either did not or could not argue that it had complied with the second option expressly authorized under the regulation.[7]

Because Anthem complied with 29 C.F.R. § 2560.503-1(g)(v)(B) by offering to provide its reviewers' notes free-of-charge upon request—and by actually sending those notes to Plaintiffs when asked—the court concludes that it may appropriately review those notes to determine whether Anthem's reviewers adequately "engaged" with the medical opinions of K.D.'s treating physicians. And, based on its review of those notes, the court concludes that Anthem's reviewers did so.

---

[7] Other Tenth Circuit opinions following *D.K.* have also cited 29 C.F.R. § 2560.503-1(g)(v)(B) without explicitly discussing the second authorized option. *See David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1312 (10th Cir. 2023) (quoting from § 2560.503-1(g)(v)(B) but omitting the language authorizing the second option); *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1299 (10th Cir. 2023) (same). The Tenth Circuit has, however, reserved the question "whether [a plan administrator's] internal notes, had they been conveyed to [the claimants] in a timely fashion during the interactive process, might have complied with ERISA's claims-processing requirements." *David P.*, 77 F.4th at 1314 n.16. And it has suggested that courts may "refer to administrators' internal records when deciding these cases" so long as the administrators did not "withhold those reasonings from claimants." *Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207, 1226 n.15 (10th Cir. 2023).

B.

Plaintiffs next argue that Anthem's denial of benefits was substantively incorrect. Based on the administrative record before it, the court can neither say that the denial of benefits was correct nor that Plaintiffs are entitled to benefits under the Plan. Rather, it concludes that a remand is necessary to resolve this issue.

Both of Anthem's denial letters relied on the Psychiatric Disorder Treatment guideline in concluding that K.D.'s care at Fulshear was not "medically necessary." AR 1233 (first denial letter), AR 106 (second denial letter). Again, that guideline establishes criteria governing when residential treatment for a psychiatric disorder will be deemed "medically necessary." *See* AR 4720. Among those criteria are that the claimant is "manifesting symptoms and behaviors" that (1) "represent a deterioration from the [claimant's] usual status," (2) "include either self injurious or risk taking behaviors that risk serious harm," and (3) "cannot be managed outside of a 24 hour structured setting . . . ." *Id.*

In the initial denial letter, Dr. Moussai focused on the third of these criteria. He concluded that K.D.'s care at Fulshear was not medically necessary under this clinical guideline because the information available to Anthem "d[id] not show 24 hour structured care [was] needed." AR 1233. On appeal, Dr. Dewar appears to have invoked both the second and the third criteria, concluding that K.D.'s care was not medically necessary under the guideline because she "[was] not at risk for serious harm [such] that [she] needed 24 hour care," and because she "could have been treated with outpatient services." AR 106.

1.

The court is unable to conclude, based on the administrative record, that Anthem's determination that K.D.'s behaviors did not risk serious harm absent structured 24-hour care was

11

correct. In the first denial letter, Dr. Moussai provided no explanation for his conclusion that Plaintiffs had not shown that K.D. needed 24-hour structured care. And although Anthem offered and then provided Dr. Moussai's internal notes to Plaintiffs in accordance with 29 C.F.R. § 2560.503-1(g)(v)(B), these notes shed little light on why Dr. Moussai believed that K.D. could "utilize [a] lower [level of care] to continue [with treatment]." AR 4791.

Similarly, in the second denial letter, Dr. Dewar failed to explain why she determined that K.D. was "not at risk for serious harm" such that she "needed 24 hour care" and thus could be "treated with outpatient services." AR 106. True, Dr. Dewar's notes explain that K.D. was "not described as dangerous, violent, threatening or aggressive" and that she did not appear to "require[ ] a 24-hour monitored setting to receive psychotherapy and medication management." AR 4797. But Plaintiffs' theory was not that K.D. was at risk of serious harm because she was violent or aggressive; instead, her parents were concerned about K.D.'s "inappropriate boundaries [with] boys." AR 4791.

In their notes, Anthem's reviewers recognized that K.D. had been "sexually promiscuous over social media," AR 4789, that she had been "suspended from school for risky behaviors with males multiple times," AR 4790, and that her boundary issues had persisted through her attempts to seek mental health treatment as an adult, *see* AR 4795–96. Yet the reviewers did not explain—either in their denial letters or in their notes—why they believed this kind of sexually promiscuous behavior did not "risk serious harm," or why 24-hour treatment was not necessary to prevent it.

## 2.

To be sure, the internal notes of Anthem's reviewers suggest that their conclusion that K.D.'s care at Fulshear was not medically necessary also rested on a determination that her

12

"symptoms and behaviors" did not "represent a deterioration from [her] usual status" as required by the Psychiatric Disorder Treatment guideline. For example, Dr. Moussai noted his conclusion that K.D. was not suffering "an acute exacerbation of symptoms," or "symptoms or behaviors which represent a deterioration from [her] usual status." AR 4791. And Dr. Dewar noted her observation that there were "[m]inimal medical changes" recorded in K.D.'s provided medical records, as well as her conclusion that K.D.'s care at Fulshear was "addressing chronic behavioral problems and relationship patterns"—not an "acute psychiatric disorder, or an exacerbation of a chronic psychiatric disorder." AR 4797. The court must thus determine whether it may consider this rationale in deciding whether Anthem's denial of benefits was correct.

As explained, Anthem complied with 29 C.F.R. § 2560.503-1(g)(v)(B) by including in the first denial letter an offer to provide its physician-reviewer notes to Plaintiffs upon request. But Anthem did not actually provide the notes themselves until *after* it issued its final denial letter. And a separate Department of Labor regulation prohibits a plan administrator from "issu[ing] a final internal adverse benefit determination based on a new or additional rationale," unless the administrator first provides the claimant "free of charge, with the rationale . . . as soon as possible and sufficiently in advance . . . to give the claimant a reasonable opportunity to respond prior to" the administrator's final decision. 29 C.F.R. § 2590.715-2719(b)(2)(ii)(C)(2).[8]

To determine whether a plan administrator has relied on "a new or additional rationale," the court must look to the denial letters (and presumably other information timely conveyed to

---

[8] Like Section 2560.503-1(g)(v)(B), this regulation implements ERISA's statutory requirements that the Plan must provide "the specific reasons for [the] denial, written in a manner calculated to be understood by the participant," 29 U.S.C. § 1133(1), and that the administrator must provide an internal appeals process affording "a reasonable opportunity . . . for full and fair review" of the benefits denial. 29 U.S.C. § 1133(2).

13

the claimant) and ask whether, based on those letters (and information), the claimant would have reasonably "understood" her claim to have been denied based on that rationale. *Cf. Spradley v. Owens-Illinois Hourly Employees Welfare Benefit Plan*, 686 F.3d 1135, 1140–41 (10th Cir. 2012); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 128–32 (1st Cir. 2004). Again, both of Anthem's denial letters invoked the Psychiatric Disorder Treatment guideline, which permits a determination that residential treatment for a psychiatric disorder is "medically necessary" only if (*inter alia*) the claimant is "manifesting symptoms and behaviors" that (1) "represent a deterioration from the [claimant's] usual status," (2) "include either self injurious or risk taking behaviors that risk serious harm," and (3) "cannot be managed outside of a 24 hour structured setting . . . ." AR 4720.

The second and third of these criteria appear to be closely related. In order to determine whether "symptoms and behaviors" can be "managed outside of a 24 hour structured setting," it is no doubt necessary to determine whether those symptoms and behaviors "risk serious harm." After all, symptoms and behaviors are presumably "managed" by treatment that eliminates, or at least appropriately mitigates, any risk that they will result in "serious harm." The denial letters thus should have put Plaintiffs on notice that Anthem's medical-necessity determination rested on its conclusions that K.D.'s care at Fulshear did not satisfy the second and third of these criteria.

By contrast, the first of these criteria—that the claimant's symptoms and behaviors "represent a deterioration from the member's usual status"—is analytically distinct from the latter two. Determining whether symptoms and behaviors represent a "deterioration" from the claimant's "usual status" does not necessarily require consideration of whether those symptoms and behaviors "risk serious harm" or what level of care is needed to "manag[e]" them. Rather,

14

that determination presumably requires only a comparison of the claimant's current symptoms and behaviors with her historical status. For this reason, the court concludes that Anthem's denial letters did not provide Plaintiffs reasonable notice that its medical-necessity determination also rested on a conclusion that Plaintiffs had not satisfied this first criterion. It follows that Anthem's conclusion regarding this criterion was "a new or additional rationale" that was not communicated to Plaintiffs before the "final internal adverse benefit determination" as required by 29 C.F.R. § 2590.715-2719(b)(2)(ii)(C)(2).

These Department of Labor regulations further provide that where "a plan or issuer . . . fails to strictly adhere to" the regulatory requirements in denying benefits, the "claim . . . is deemed denied on review without the exercise of discretion by an appropriate fiduciary." 29 C.F.R. § 2590.715(b)(ii)(F)(1). The regulations thus suggest that if a plan administrator denies benefits in reliance on "a new or additional rationale" not timely communicated to the claimant, then the remedy is simply that the court conducts a *de novo* review of the claim, affording no deference to the administrator.

Nonetheless, in several recent cases, the Tenth Circuit has gone much further, holding that a plan administrator's assertion of an untimely "new or additional rationale" in support of a denial of benefits results not in *de novo* review of the denial, but rather in judicial refusal to consider the new rationale *at all*. *See, e.g.*, *David P.*, 77 F.4th at 1313 (10th Cir. 2023) (holding that "a court reviewing an administrator's benefits decisions cannot consider reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the claimant"); *Ian C.*, 87 F.4th at 1226 (concluding that the court's decision in *D.K.* "forecloses" the argument that "reviewers' internal notes are properly part of the administrative

record," and that "[o]nly the rationales articulated to the beneficiary in the denial letter are eligible for review, both in the administrative appeal and before this court").

In accordance with these controlling precedents, the court will not consider whether Anthem's denial of Plaintiffs' claim for benefits for K.D.'s residential treatment at Fulshear was justified on the ground that her symptoms and behaviors did not "represent a deterioration from [her] usual status" because the denial letters did not afford Plaintiffs reasonable notice that the denial rested on this ground and because the reviewers' notes—which did articulate this rationale—were not communicated to Plaintiffs until after Anthem's final adverse benefits determination.

### 3.

Although the court cannot say, based only on those rationales that it may properly consider, that Anthem's denial of benefits for K.D.'s treatment at Fulshear was correct, it also cannot say that Plaintiffs are clearly entitled to benefits under the terms of the Plan. *See Carlile*, 988 F.3d at 1229; *Brian J.* --- F. Supp. 3d at ---, 2023 WL 2743097 at *6.

Plaintiffs point to three letters from K.D.'s treating professionals to support their argument that K.D.'s residential treatment at Fulshear was medically necessary. In two of those letters, however—one from Taylor Watts, K.D.'s provider at Red Mountain Sedona, and the other from Erin Grover, a therapist at WinGate—the providers did not actually recommend residential treatment for K.D. but instead suggested other treatment. Ms. Watts explained that Red Mountain Sedona therapists and K.D.'s parents "discussed the lack of progress by [K.D.]" and that the therapists recommended "a single gender program that would allow [K.D.] to work deeply on core issues." AR 8893. And Ms. Grover, after noting that K.D. had successfully completed a five-week program at WinGate and been discharged because she "was ready to

move onto the next phase of her treatment," recommended a "young adult transition program." AR 8891.

To be sure, one of Plaintiffs' letters, written by Dr. Todd Corelli, a licensed clinical psychologist at Discovery Ranch, *see* AR 2124–40, did recommend "intensive residential treatment" "for the foreseeable future," AR 2138. But Dr. Corelli's letter was written in March 2016, *see* AR 2124—more than a year before K.D. was admitted to Fulshear—and K.D. received treatment at two additional facilities between her discharge from Discovery Ranch and her admission to Fulshear, *see* AR 2122. The court believes that Dr. Corelli's letter is too remote in time to provide much insight into whether K.D. still needed residential treatment when she ultimately sought admission to Fulshear.

Plaintiffs also emphasize that, at the time of K.D.'s admission to Fulshear, Dr. Norma Clarke, a psychiatrist, diagnosed K.D. with "Attachment Disorder" and "Borderline Personality Disorder," recommended residential treatment, and stated that the "client needs 24 hour support for her behavioral issues." AR 2039. But all of this was in an unofficial admissions note written before Dr. Clarke had even met K.D. *See* AR 2040. Further, Dr. Clarke did not explain why she believed K.D. needed 24-hour care. *See* AR 2039. Rather, she left blank the sections of the admissions form that should have included this explanation. *Id.* Without knowing why Dr. Clarke believed K.D.'s history and diagnoses justified 24/7 residential treatment, the court concludes that it can neither place significant weight on her sight-unseen recommendation for K.D. nor fault Anthem for not doing so.[9]

---

[9] Dr. Clarke's recommendation also appears inconsistent with K.D.'s treatment record at WinGate. Dr. Clarke stated that K.D.'s "behavior was so bad" that WinGate "decided not [to] send her back to Red Mountain [Sedona]." AR 2040. But the WinGate records indicate that K.D. graduated from the program there and describe her on multiple occasions as making "average progress" and completing therapeutic assignments. *See* AR 2092, 2098, 2101.

\*    \*    \*

Because "'the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision,' but 'the evidence in the record' does not 'clearly show that the claimant is entitled to benefits'" the court concludes that a remand is appropriate. *Brian J.* --- F. Supp. 3d at ---, 2023 WL 2743097 at \*6 (quoting *Carlile*, 988 F.3d at 1229 (cleaned up)); *cf. David P.*, 77 F.4th at 1316 n.17 (holding that remand rather than an award of benefits is appropriate where the record "contains both evidence supporting Plaintiffs' claims for benefits and evidence supporting the denial of benefits").[10]

For the foregoing reasons, Anthem's motion for summary judgment is **DENIED**. Plaintiffs' motion is **GRANTED IN PART** and **DENIED IN PART**. Plaintiffs' claim for benefits is **REMANDED** to Anthem for reconsideration.

**IT IS SO ORDERED**.

Dated this 30th day of January, 2024.

BY THE COURT:

_____
Howard C. Nielson, Jr.
United States District Judge

---

[10] The scope of the remand will, of course, be subject to the limits imposed by Tenth Circuit precedent. *See, e.g.*, *David P.*, 77 F.4th at 1315–16.